Good morning. Welcome to the 11th Circuit. We are happy to have you here with us today. We have three cases on for hearing today, and I'm sure you are all familiar with our lighting system, but just as a quick refresher, when the yellow light goes on, you have two minutes left. When the red light goes on, your time is up. We ask that you please respect that red light and complete your presentation at that time, unless we have questions, in which case we do want you to answer those questions, even if they take you over at the red light time. We wouldn't ask the questions if we didn't want to hear the answers. And with that, we'll begin today with the case of Watts v. Sheriff of Oconee County Sheriff's Office. We'll hear first from Mr. Jones. Good morning, Your Honor. May it please the Court. Julia Moss is a mother of five who was in the throes of a mental health crisis. When the officers came to the place she was staying, the man she had gone home with the night before, who had called the police because she wouldn't leave the next morning, the officer said, under oath, he said, I'm 100 percent convinced we're dealing with a mental patient here. And when the officers approached the room where she had secluded herself, she screamed out, in the name of Elohim, get out of my house. She made references to John Gotti. She made references to Mario Andretti. She asked to speak to someone named Tasha, someone else named Ilan. This was a 10-minute encounter where there was time to deliberate. What was supposed to be happening during that time of deliberation? I mean, I don't, at least I'm speaking for myself, there's no question that Ms. Moss was undergoing some kind of crisis. But given the video, which I take as the strongest evidence as to what actually occurred, what are you arguing the police officers should have done instead? They should have followed their de-escalation training. And there was no need for them to advance upon them. They knew an ambulance was coming. Both of them had had de-escalation training. One had had crisis intervention training. And as the Supreme Court recently reaffirmed in Barnes v. Felix, the totality of the circumstances, meaning all the circumstances, is what is relevant. I've heard you say wait on the ambulance, but what are de-escalation trained medical personnel going to be able to do with a woman who I agree was obviously in the throes of a crisis, but had a knife and was, it seems, perhaps a danger to herself in addition to a danger to others? I don't, I don't see that it was necessarily possible to just shut the door and walk away. The door was closed until they opened it. In fact, they said to kick it. They said kick it and they didn't have to. Right, but She was sitting on the floor. Right, but the problem is also the EMTs were not going to be able to, I mean, there was testimony in the record from Lieutenant Weems that the EMTs would not be able to enter the room to help her unless and until all weapons had been removed. And there was evidence that the officers were aware that she had a knife with her before they even opened the door. So I'm not sure what else, how would the officers have been able to disarm her so that the EMTs could get there and, and assist her if they didn't first get, I mean, how are they supposed to do that if they didn't open the door? Well, they opened the door. They had about a six minute confrontation where she was lying on the floor in one corner of the room. They were standing in the doorway, one officer pointing a gun and hollering commands at her the entire time. The other officer with a non-lethal weapon, a taser, standing next to him. And they could, there's expert testimony in this case on, from, from an expert who, in both law enforcement and forensic psychology has written textbooks on both, that the reasonable approach would not have been to approach her with weapons drawn. In fact, she wanted them out. She I'm, I'm still not hearing what they should have done in your view. Well, what they should have, they should have done nothing. Because at some point she may get up, go to the bathroom, she may fall asleep. You don't know what she's going to do. They can call a crisis. But she might also take the knife and hurt herself. I mean, at one point in the video, she's pointing the knife at her groin. I mean, that's what's going on. So she's, the, the, the jury, there's different interpretations of that video. She's basically holding a knife in her lap, but she's not making any effort to stab herself. Well, she's not holding it in her lap. I've watched the video several times. Well. She's holding it out in front of her groin and she's pointing it at herself. And. So they shot her to keep her from doing that? No, they shot her. I'm sorry, go ahead. No, go right ahead. I mean, the video also shows her, some would say lunging towards the police officers. And you definitely hear, I'm gonna, and it sounds like kill you. So that's when the, the shots occurred. Now you might have an excessive force argument because the number of shots, but the shooting itself, the video shows when it occurred and it occurs when she's approaching the officer. Yes, but then that, that, that is ignoring the totality of the circumstances and all the facts that need to be considered. In the Felix, the Barnsley-Felix case, the court focused on two seconds where the suspect actually comes at the officer with a hatchet. No, I'm sorry, with a knife. And the court said that you have to consider the entirety of the circumstances because that puts those two seconds into, into, into perspective. And in this case, and so, and then in the totality of circumstances, I mean, even in your introduction, when you describe why her male, the owner of the place called the police officers, it wasn't just because she kicked him out of his own home, but also because she struck him and struck the dog. So there's already indication in the totality of the circumstances of a propensity towards violence, at least in this situation. Yes, in the totality of circumstances, there are facts going both ways, and the jury has to weigh those counterbalancing considerations and not us. I mean, by recognizing that there are many facts, many circumstances here, and there's a clearly established rule, it's up to the jury to decide whether under the, whether the facts of this case, which side of the line, the clearly established line these facts fall on. I think, I think, you know, that's not true though, because it has to be that a jury could reasonably come to the conclusion that there was, there was excessive force, or this did fall on one side of the line. And if it's a close call, then the purpose of qualified immunity is to protect officers who are making those decisions in real time and not looking at those decisions later on a cold record. Well, you're right. It's a, it's a, it's a fair argument, and it could be a winning argument. But there also, we, jurors could also reasonably believe that there was no need to shoot this woman six times. There was no need to invade her space. She's crazy. But when the jury could think that she's lunging at them to, to actually get out, she's trying to chase them out of what she thought was her house. And I don't see her, and I don't see her trying to move with the weapon itself. Well, she clearly had the, the knife, she clearly had the knife with her. It's not a knife. It's a, it's a sheetrock saw. It appeared to be a knife though, in the video. And it's certainly, the officers thought it was a knife. The, her, the man she was, that she was staying with said she had a knife and the officers referred to it as a knife in the video. So, and it was a reasonable, I think it was a reasonable interpretation of what it appeared to be. And in any case, it, it was serrated and could have done some serious damage. With the evidence going back and forth, yes, you could have broken the skin. But the point, but the point is that at the time that she ran at them, she had the knife with her. If you want to call it a saw, that's fine. She had the saw, whatever, the weapon with her. And there's no question about that. Whether it was held up above her head or down by her side, I don't know why that really makes any difference in this case. Well, there's a lot of cases saying it makes a difference. Mercado versus Sorte Orlando. There was, there's several cases. There's three in particular. But there's a lot of, cases even involving knives, hatchets, which I've cited, which if it's not actually being raised in a threatening manner, it's up to the jury to decide whether they feel that that was a reasonable response to that threat. The other thing, too, is even when he shot her six times, she's still holding on to the knife. So what good did it do to shoot her? I mean, it, I'm not even sure she knew she had the knife in her hand at that point. But there were other alternatives available. Well, why doesn't- I still have not heard, I still haven't heard another alternative besides just waiting and doing nothing, which- That's an alternative. It's better than killing somebody. And they do it all the time. They have a mobile crisis team. Well, why does it say, I'm trying to help you? On the video, the police officer says at least maybe 10 times, I'm trying to help you. I'm trying to help you. Come out the room. I'm trying to help you. Why doesn't that qualify as a de-escalation technique? It's a, it, it's not. It's an accelerated, it accelerated her resistance. You know, screaming at somebody trying to help you while pointing a gun at them is not the only way to handle the situation. There was a point- There's also state law claims as well. There was a point where she put down the weapon and it looked like maybe things were going to resolve, right, during the video. And then she picked it up again. So I don't even know that you can, that you can say they didn't try to de-escalate it. Maybe they didn't try to de-escalate it in all the best ways. That's the point. That's fair though. Is it reasonable? Are there other alternatives available? That language is in Barnes v. Felix. It's also in Graham v. Connor, which was decided back in my Federalist Society days at Wake Forest Law School, where I was a charter member. This has been the law for 30 years. The question here is what facts are they allowed to look at? And the Fifth Circuit said that you just look at the two seconds when the gun was fired. They said that you have to look at the encounter and it can cut either way. There are situations where looking at the totality, a jury might find it was reasonable, or looking at totality, they may find it was not reasonable. All right. Thank you very much. Thank you, ma'am. Thank you, Mr. Jones. You've reserved five minutes. We'll hear from Mr. Williams now. Good morning, Your Honors. May it please the Court. My name is Terry Williams. I represent the appellees Corporal Andrew Henderson and Oconee County Sheriff James Hill. The District Court properly held that qualified immunity protects Corporal Henderson because a reasonable officer in his position could have believed that the decedent, Moss, posed an imminent threat of serious bodily injury. The information the deputy had when he arrived at the scene was that the homeowner had been attacked by this lady. He saw injury on the homeowner's head. She had attacked the dog. He saw an injury on the dog's head. The deputy was told that she had a weapon, she was in the house, and that there was a roommate in the house that was still in danger in the back bedroom, which was right near where she was located. I did wonder why they didn't ask their roommate to leave. Well, that's, I don't know. That was never developed in the record. I think he was, maybe, you know, they just focused on trying to disarm her, trying to deal with her and get her out, rather than trying to remove him. The bedrooms, as I understand it, I think in the record, were right across from each other, so the doors were, and he was, he had closed the door. And he really, and there is evidence that he was in there? Yes. I just found it surprising thinking if that was going on outside my bedroom door, I might step out, but. I guess that's up to him. Well, but I think for me, the point of that is, in terms of de-escalation, it's also minimizing the harm. So is it, why would it be unreasonable, assuming you consider it to be, for the police to first secure the location by removing any other potential victims? Your Honor, that is something they could have tried to do. I would suggest that could have been a dangerous situation to try to move somebody out of a room when she was already right across from there and at any point could have. But with the door locked, saying, I'm not going to open the door, get out of my house. So that does seem a window of opportunity. And to the totality of the circumstances consideration, if indeed part of the officer's concern was to minimize danger to others, it seems like that would have been a first step. So to counsel on the other side, why isn't that a reasonable consideration in terms of failure to de-escalate? That could have been something they could have tried to have done. But I think the focus of the deputies were to try to deal with her, to try to reason with her and see if they could get her to come out and restrain her, disarm her, get her help at that point. Although to be fair, I mean, in all seriousness, if you're dealing with a situation where a person, not the decedent, but the roommate is in their room and not exiting when all this is going on, then perhaps that would have introduced a greater degree of instability to the situation. But anyway, it's not on the record. So actually, did Henderson and Swisher actually testify about this and say that they didn't remove the roommate or try to remove the roommate because they would have had to turn their backs on the bedroom when Moss was in it and it was just a tight space? It was a very tight space. I don't recall whether there was testimony about whether they had tried to make any contact with the roommate. They just knew they had been told there was a person in there that was in that bedroom. And then I think they just focused on trying to get Ms. Moss to come out and to deal with what was going on there. I would point out, too, in the record, I mean, the appellant has made a lot about her having a mental illness. Well, the toxicology showed she was highly under the influence of drugs. So there's no indication she had meth, THC, some other things. I'm not sure that really matters, though, because it's clear that the point here is that she wasn't really acting in a rational way. And regardless of what the reason for that is, I think we can all agree that that was clear. Right. I think the point, though, is that they're saying that they should have gotten her mental health treatment. And I don't know that there's any mental health treatment at that point in time that would have done any good given the intoxication. Well, you actually are raising a question I have about de-escalation techniques as well. I mean, it should be the plaintiff's burden, I think, to establish what those techniques are, but I didn't hear that during his presentation. So can you please share what are, and not saying that I'm describing liability, I just want to be clear, what were the techniques that the officers were trained to exercise that the plaintiffs suggest were not utilized? Well, I think both of the deputies had received some training in de-escalation and critical encounters, something along those lines. And as I think one of your honors pointed out, they did attempt for quite some time to de-escalate the situation with Ms. Moss, telling her to come out to talk to them, that they were there trying to help her. They had summoned EMS to come out, but of course EMS is not going to deal with her until they get her restrained and disarmed. I mean, I've handled numerous cases like this over the years, and they're just not going to do that. They're not going to put themselves in harm's way with somebody who's been reportedly, you know, attacking folks and has weapons. But they were trying to do things to de-escalate and to get her help, whatever her situation is. They didn't know what was going on with her. I mean, these statements that she was making could be the indication of drugs, of being high on drugs and things. And so to suggest that they should have been somehow calling for some mental health person to come and then just sit there and wait till somebody comes to try to talk to her was just, I think, not reasonable and would have been illogical. Well, especially since she had already been violent with others and, as Judge Rosenbaum pointed out, potentially was a danger to herself. Absolutely. I think that was another justification for going on in and trying to deal with her before she hurt herself. And under, you know, well-established law, officers can take action to help someone in a crisis situation for their own well-being. Even if they didn't have probable cause, they could have attempted to detain her for her own safety. In this case, they clearly had probable cause to arrest her, given all the information they were provided by the homeowner and her refusals to come out and to talk to them. But putting aside, I think, a very legitimate concern as to whether she was a danger to herself, other than that concern, her staying in the bedroom, keeping the door locked away from the roommate, away from the officers, was ended up arguably was more safe than what happened, which is opening the door, pointing the gun and some would say agitating the situation even more. Well, they opened the door. Officer Henderson did not point the gun until she displayed a weapon. So at first, he was just going to try to see what's going on with her. Can we get her to come out? And then she first lit a blowtorch and held it and then had the sheetrock saw, which I believe is more dangerous than some knives. I mean, it's a long pointed, serrated implement that clearly could cause serious bodily harm, as the district court noted. But that's what resulted in Corporal Henderson drawing his weapon. But to open the door, just to be clear, what you're saying was to effectuate an arrest. So opening the door and gaining physical access to her was non-negotiable at that time. Is your position? I'm sorry. Meaning in terms of instead of leaving the door closed and if she was high, letting that wear off, instead of doing that, the officer really had no other choice but to open the door at that time. And if so, it was to effectuate an arrest. Well, Your Honor, I don't I don't think it's a question of whether the officer had no other choice. I think it's what's reasonable under the circumstances. And that is a number of things to protect her from self-harm, to protect any others in the house, to enforce the law. But the law, I think the cases do allow for consideration of whether the police exacerbated the situation. In other words, increased the harm that already might have existed. I don't think the deputies would have been on notice of any case law that required them to wait under those circumstances. Because I think they didn't know until the door was open that these events were going to develop the way they did. I think it was a rapidly occurring situation, dynamic, and once they opened the door and then she began arming herself, they had the right and it was reasonable for them to then protect themselves. And it's important to note they were trying to use alternative methods as this is developing. And they're giving her commands to put the weapons down. Deputy Swisher is trying to get into position to use a taser on her, which would have been, you know, a way to deal with the situation and would not have caused this type of harm. But unfortunately, given the narrowness of the hallway and the door as he's trying to get in position, she then rushes. And he does discharge the taser. But at that point, it's not effective because she's already moving toward them. And that's when Corporal Henderson fires. And so the question for qualified immunity is not, did they make the best possible choice considering everything we know now sitting here in the courtroom? Although maybe they did, but that's not the question, right? The question is, did they take actions that a reasonable officer in that or that an officer in that situation would think were reasonable, right? Yes, Your Honor. That's the standard under qualified immunity is whether a reasonable officer in the position of the defendant could have believed that deadly force was necessary. And we certainly believe that that is the case here and that qualified immunity should protect the deputy. But your other argument is that even if that was not reasonable, it wasn't clearly established. That's correct, Your Honor. Okay. Yes, it's a two-pronged test. First, whether it was a violation of the Fourth Amendment. And then secondly, whether it was a violation of clearly established law. And we believe that either prong that the deputy should be given qualified immunity. And I believe the totality of the circumstances, just to address the recent decision by the Supreme Court in the Barnes v. Felix case, we're not asking the court to just look at that very moment of the use of deadly force. It is all the attendant circumstances that we think when you add all these things up, that it clearly supported the use of deadly force in that situation. This is a case I think that's pretty different than Barnes because the argument the whole time has been about the complete sequence of events, starting with the homeowner who had been injured by her and, you know, starting from there and continuing through everything that happened. And it seems that, to me, this case looks like what Barnes would have us analyze as a court, rather than looking at just the moment where she rushed the officer. The analysis, as far as I can tell, started, you know, about 18 minutes before that, judging from the tape. Yes, Your Honor. I agree with that. And, you know, it is a tragic set of circumstances. Of course. Of course. And, but I think the officers acted reasonably in an attempt to protect Ms. Moss. Things went downhill from there, but then they acted reasonably to protect themselves. And the other decisions of the district court, that the sheriff can't be held liable under these other theories, I mean, I think the court made the correct decisions about that. Sheriff Hale cannot be liable in the theory of a violation of the ADA or Section 504, you know, that alleges they should have gotten her, you know, mental health treatment during this situation. And then as to the state law claims, which were mentioned, the official immunity, essentially for the same reasons that qualified immunity applies. Official immunity under Georgia law applies to the claims of battery and negligence. So, we urge the court to affirm the decision of the district court dismissing all claims. Thank you. All right. Thank you, Mr. Williams. And Mr. Jones, you have five minutes. The evidence is structured, looking at it in totality, at the jury, whether guided by expert or testimony or not, and there is expert testimony in this case, by the way. The two officers combined weighed between three and four times as much as this small woman did. They already had a taser drawn. They didn't have to shoot her six times. There's a lot of questions that need to be decided, and they could go either way. But I think that, I think that is what we would do or what a jury would do in the absence of qualified immunity, right? That would put in the ordinary question to a jury of whether this was how it should have happened. But for qualified immunity cases, we look at to spare officers of not only a verdict against them, but even the trial. We look at whether a reasonable officer in that situation would have believed that this was an appropriate amount of force. So, why in this situation was it completely unreasonable? Such an officer would have had noticed that what they were doing here was unconstitutional. For qualified immunity, and I handled Hope B. Pelzer, I know a little bit about it. Qualified immunity means that viewing the facts and the like most favorable to plaintiff, what a reasonable officer had believed that what they did was justified. So, you got to view our spin on the facts and not theirs. They're not entitled to any inferences about what would have could or should have happened. Right, so here, she, from her viewing the facts in her favor, she had harmed the, no one denies that she harmed the man she went home with, right? According to what someone told the officers outside their presence, who she'd apparently been doing drugs with all night. Right, but I've not heard that question. I've not heard a dispute of fact about whether that wound on his head was from her. Is that something that you've questioned? I don't question that. It's a superficial wound. A jury could find that, yeah, he had a reason to call the cops. But my expert says that this is a classic 1013 situation. No crime was committed in their presence. And they're clearly dealing with a medical emergency here. They've got the EMS on the way. And one of the officers says, I'm 100% sure we're dealing with a mental patient. So given the totality of those circumstances, if we look at the event in its entirety, there are really two ways of evaluating the seizure here. There's actually two seizures that took place. First, a seizure technically occurred under Brower v. Vigno and all these other Fourth Amendment cases. When they stood in the doorway with a gun and a taser that was never used, by the way, pointed at her, she was not free to leave. There was a governmental termination of movement. Is this a debate in terms of that there was a seizure or some kind of seizure occurred? No, but there's a debate. If that's a seizure, if the seizure is the entire incident and any portion of that was unreasonable and it had the seizure initially been treated differently, she might not be dead today, might not be alive today. That's up for jury. She might not be dead today. But you can look at the seizure from that perspective. Was that reasonable, the fact that they seized her at that moment? Did you raise any of this in your brief about whether they should have even gone in the house? Pardon? Did you raise in your brief the points that you're making right now? I talked about reasonable. A seizure can be an intentional termination of movement outside of Brower. It can also be the use of deadly force. Typically, deadly force situation, if there's no seizure until the deadly force is used and the deadly force itself becomes a seizure. And there are cases that reject the idea of a continuous seizure. So you're saying that if someone is harmed by a guest in their home, whether they were doing drugs all night or not, and that person is obviously a danger to themselves and other it's unreasonable for the police to go inside the home that that person does not own. Oh, no, no. It's not the home. And if the home was OK, I'm saying that the seizure occurred when they blocked the bedroom door, stood there pointing guns at her, a gun and a taser at her. And it was clear that she was not free to leave. A seizure, a Fourth Amendment seizure actually occurred at that point and culminated with her death six minutes later. Anything. OK, you're almost out of time, Counselor. So my next question to you is about the full scope of the excessive force. There were a lot of shots here. Any arguments or points you want to make on the number of shots? Yes, a jury could decide that one was too much. They could decide that six was too much. They could have decided, let this guy shoot his taser instead. You got a guy who used lethal force six times and you got another guy with less lethal force and you got two guys with tons and muscles who could have easily overpowered her taking that out of her hand. Did I miss that? Did I miss that in your brief? Did you make that argument? Yes, I did.  And again, with respect to the as far as the ADA and. Well, I'm sorry you're out of time, but thank you very much. Thank you very much. Mr. Jones. Thank you.